**Raymond L. BENN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 03–CF–946.**

District of Columbia Court of Appeals.

Argued Jan. 5, 2006.
Decided Sept. 3, 2009.

---

Lee Richard Goebes, Public Defender Service, for appellant. James W. Klein, Sandra K. Levick, and Erin Murphy, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese III and Colleen Covell, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, RUIZ, Associate Judge, and SCHWELB, Senior Judge.*

RUIZ, Associate Judge:

Raymond Benn appeals his convictions, after a second jury trial, for the armed kidnapping of Charles "Sean" Williams on December 1, 1992. This appeal raises an issue we have grappled with before, the admission of expert testimony on the potential unreliability of eyewitnesses. For the first time, however, we do not affirm the trial court's exclusion of the proffered expert testimony. In excluding the expert testimony proffered by appellant, the trial court applied incorrect legal principles. It came dangerously close to employing a *per se* rule of exclusion and made a determination that contravened a holding of this court following the first trial. Moreover, the court did not follow the analysis established in *Dyas v. United States*,[2] which requires the trial court to consider three distinct factors in determining whether to admit expert testimony on the reliability of eyewitness identifications, and to do so in the context of the proffered expert testimony and evidence in the particular case. Because we cannot say that exclusion of the expert testimony proffered here was harmless, in a case that depended exclusively on the identification of eyewitnesses, we remand for further proceedings consistent with the analysis set forth in *Dyas* and this opinion.

We do not reverse appellant's convictions nor do we order a new trial. Rather, we remand and instruct the court to consider the credentials of appellant's proffered expert and the admissibility of his testimony in accordance with the three criteria established in *Dyas*. We note that while the trial court expressed the view that appellant's expert was qualified, and the government generally did not contest his qualifications, the trial court has not ruled on the particular scientific studies that appellant's proffered expert, Professor Steven Penrod, planned to use or their application to the government's evidence in the case.[3] Because such fact-intensive analysis is best conducted by the trial court, we leave the determination to its discretion in the first instance. We add

---

* Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

2. 376 A.2d 827 (D.C.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977).

3. *Cf. Steele v. D.C. Tiger Mkt.*, 854 A.2d 175, 181 (D.C.2004) (describing the balance between admissible and inadmissible expert evidence as "easier to state in the abstract" and requiring "a considerable measure of judicial discretion" to implement).

that even if the trial judge decides, after considering all the relevant factors for admissibility, that the proffered expert witness is qualified and that his testimony should be admitted, the trial judge retains discretion to place reasonable limitations on the expert's testimony to avoid overwhelming the jury or unduly burdening the court, so long as these limitations are consistent with the requirements of the defense.[4] In particular, the trial judge may prohibit "the introduction of ultimate conclusions by an expert witness as to the truthfulness of a witness ... and the guilt of the defendant."[5]

### I. Trial and Retrial

The trial in this case followed our remand for a new trial in *Benn v. United States (Benn I)*.[6] There, we directed the trial court to permit appellant to present evidence supporting his alibi defense, that appellant was at his mother's house celebrating her birthday on the evening of the murder.[7] At the first trial, appellant had been convicted of felony murder while armed[8] and of related kidnapping, assault, and weapons charges, in connection with the shooting death of Sean Williams. We reversed his convictions because the trial court had refused to allow appellant's mother to retake the stand after she had sat in on the trial during the testimony of her son in contravention of the trial

judge's rule on witnesses. The defense proposed to call appellant's mother in order to rebut the suggestion of the prosecutor, while cross-examining appellant, that he and his mother had rehearsed his alibi. Appellant had proffered that the reason they had not talked about the case was because defense counsel had cautioned them not to do so, and he wished to assure that the jury would be informed of that fact.

At the second trial, however, appellant did not renew his alibi defense, and neither he nor his mother testified. Instead, appellant's defense centered on challenging the reliability of the identifications of the witnesses who testified that appellant was one of the men who kidnapped Sean Williams. Prior to trial, appellant sought permission to present expert testimony on the "unreliability [of] stranger-to-stranger eyewitness identifications" and certain other specific factors that, according to appellant's proffer, can affect the accuracy of an eyewitness's identification and recollection. Appellant proffered as his expert Professor Steven Penrod, a well-known scholar with many published articles in the area of eyewitness identifications. At the conclusion of the second trial, the jury, after deliberating for over a day, found appellant guilty of armed kidnapping and the related weapons offense.[9] Unlike in the

---

4. *See State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208, 1219 (1983) (noting that "the consumption of time involved in taking testimony of the expert witness in question was certainly not 'undue' in comparison with the importance of the issue").

5. *Mindombe v. United States,* 795 A.2d 39, 43 (D.C.2002); *see People v. Drake,* 7 N.Y.3d 28, 817 N.Y.S.2d 583, 850 N.E.2d 630, 633 (2006) (noting that trial court should instruct jurors that "if they accept the expert's testimony, they may consider it along with all other evidence in the case in determining whether the [state has] proved the defendant's guilt beyond a reasonable doubt").

6. 801 A.2d 132 (D.C.2002).

7. *See id.* at 136–39.

8. *See* D.C.Code §§ 22–2401, –3202 (1981) (current versions at D.C.Code § 22–2101, –4502 (2001)).

9. *See* D.C.Code §§ 22–2101, –3202 (1981) (current versions at D.C.Code § 22–2001, –4502 (2001)) (conspiracy); D.C.Code § 22–3204(b) (1981) (current version at D.C.Code § 22–4504 (2001)) (possession of a weapon during a crime of violence).

first trial, the second jury acquitted appellant of murder.[10] The sole issue presented in this appeal is whether the trial court abused its discretion in rejecting the proffered expert testimony.

## II. Facts

In the second trial, as in the first, the government's case relied exclusively on the testimony of five members of the Mahoney family, none of whom knew or had ever seen appellant before. Each of these witnesses selected appellant from a photo array and identified him in court as "the taller" of two unknown men who entered their Southeast Washington, D.C. home, on December 1, 1992, and forcibly abducted Sean Williams. The gist of the trial testimony concerning their identifications follows.

Marcelle Anthony Mahoney, then thirteen years of age, was returning home when he saw "a tall guy about—oh 6'3", 6'5", dark-skinned, wearing glasses, standing in the middle of the street [outside a double-parked] car." This made Marcelle afraid, so he hurried inside. A few minutes later, that same tall man, and a shorter man who had a black gun, dragged Sean Williams into the apartment. Marcelle testified that he was "kind [of] frantic about seeing the gun."

The two intruders went to the bedroom of April Mahoney, who was Sean Williams's fiancée and the mother of his child. She noticed that although it was December, her fiancé was wearing only a T-Shirt, without a coat, and that he had blood all over his face and clothes. The shorter unknown man, who was wearing her child's panties on his head, ordered April to leave the room and to take her baby, along with Darren and Marcelle Ma-

honey, out of the bedroom. Darren Mahoney, who was twelve at the time, testified that he stayed at least long enough to see Williams "rambl[e]" around April's room as he kept asking, "April, where my stuff at?"

Willie Mae Mahoney, April's mother, testified that she was in her bedroom and became alarmed when April told her about the sudden appearance in the home of the two unknown men. When April was unable to explain why the men were there, Willie Mae "hollered" at them to not "disrespect [my] home." As the intruders walked out of April's room without responding, Willie Mae followed them and repeated her demand, leading the taller man to calmly explain that he would commit no violence toward, and intended no disrespect of, her home. When she tried to talk directly to Sean Williams, the tall man interrupted her, saying, "[Sean is] going to be all right. He ... has to settle a debt," and the three men left. Willie Mae Mahoney testified that Sean Williams looked "scared" and "pitiful."

William "Butch" Mahoney, Willie Mae's son and April's older brother, testified that he was in the kitchen when the men entered the home. He followed the intruders as far as the front step, and from there he called out to Sean Williams, who tried to give an optimistic response, while the two men pulled him into a car and drove off.

The intrusion into the Mahoney home lasted about six minutes. That was the last time the Mahoneys saw Sean Williams alive. His bullet-ridden body was discovered nearby early the following morning on the grounds of an elementary school.[11]

Approximately one week after Sean Williams's murder, the Mahoney family

---

**10.** At the first trial, appellant was convicted of murder and sentenced to a total of thirty years to life imprisonment. At the second trial, appellant was sentenced to a total of fourteen to forty-two years imprisonment.

**11.** *See Benn I*, 801 A.2d at 135.

was shown a stack of nine photos from which each identified appellant as the taller of the two men who had entered their home.[12] Darren, Marcelle, and Willie Mae Mahoney made these identifications one after the other, while Butch viewed the photo array later the same evening, and April several days later. Detective Mayberry testified that prior to making their identifications, Darren, Marcelle, and Willie Mae were all placed in a back bedroom of the apartment. Each would then come individually to the dining room to view the photos, and then go to the living room. However, Willie Mae Mahoney testified that after her grandsons viewed the photographs, they returned to her, in the bedroom. Neither Darren nor Marcelle could remember the sequence in which they moved from one room to another.[13]

Following the identifications, April Mahoney testified, "we never discussed pictures, we just discussed what happened," but Butch Mahoney contradicted her, admitting that he discussed his identification of appellant with his family. At the time they identified appellant from the photo array, Marcelle, Willie Mae, and April Mahoney expressed "95%" certainty that they had correctly identified appellant as one of the perpetrators. This, we said in *Benn I*, was a remarkable "coincidence" that "understandably troubled the judge [during the first trial] and indicates, at least, that someone probably suggested something to somebody." [14]

At appellant's two trials, the government presented only the testimony of the five members of the Mahoney family present at the time of Sean Williams's kidnapping. There was no evidence of motive, for example, that appellant (or anyone connected to him) was owed money by Sean Williams. No relationship was established between appellant and the "shorter man" who entered the house, or with the car in which the men drove off with Sean Williams. The prosecutor presented no physical evidence linking appellant to the abduction at the Mahoneys' home or the place where Sean Williams's body was found.

All five members of the Mahoney family acknowledged that they did not know and had never before seen either of the men who entered their home and abducted Sean Williams that day, nor did they have any other knowledge of the men.[15] But

**12.** Detective Mayberry, of the Metropolitan Police Department, told the Mahoneys to "[t]ake a look at [the pictures] and tell me if one of the people is the people that came into your apartment with Sean." The array was composed of pictures of appellant and of foils who were selected to look like the picture of appellant, and not geared to the description of the culprit given by the Mahoneys. Detective Mayberry, who constructed the photo array, was asked, "when you're thinking about what characteristics to go on, you pay attention to what the witnesses have told you they saw when they saw the suspect, right?" The detective responded, "Not so much as that. Once a suspect is developed and there is a photograph of that suspect, then in making a photo spread then I will go along the lines of the picture itself." The record does not reveal how the police came to identify appellant as a suspect.

**13.** Curiously, Butch Mahoney testified that he remembered the family gathering in one of the two bedrooms in the apartment (he could not recall whether his sister April was present). He described how each would go from the bedroom to the dining room to view the photographs. Then, he testified, each would go to the second of the two bedrooms (Willie Mae's) in the apartment. Even after being reminded that he had not been present when Darren, Marcelle, and Willie Mae made their identifications, Butch insisted that each one left the dining room, after making an identification, and went to Willie Mae's bedroom.

**14.** *See Benn I*, 801 A.2d at 145.

**15.** *See id.* at 134.

they each positively identified appellant as the taller of the two men who had entered their home. Each witness was impeached with various inconsistencies concerning his or her initial identification from the photographs that were presented in the days after the kidnapping.[16] When the Mahoneys first selected appellant's photograph, several did so with some qualification: April said that appellant's photograph "looks like the guy" who abducted Mr. Williams; Willie Mae thought that appellant "looks like the guy if his face were slimmer"; and Darren thought "that looks like him." Marcelle picked out appellant's picture saying that it "looks like the person." By the time of the second trial, however, the qualifications had disappeared. Darren testified that he was "absolutely positive"; April said she was "very sure" that appellant was the "tall guy" who had come into their apartment; Marcelle testified, when asked how he could be sure, that appellant "looks just the same" as the kidnapper; Willie Mae

said she was "sure" that appellant was the same "gentleman" who entered her house "[b]ased on the way he's looking at me"; and, referring to both his photo and in-court identification, Butch Mahoney said, "I'm sure then, and I'm sure now. That's him." The witnesses expressed this high level of confidence in their identifications of appellant after each was asked at the second trial to confirm that they had previously twice identified appellant, first from the photo array and, a second time, under oath at the first trial.

## III. Eyewitness Identifications

Although the testimony of a single eyewitness can be sufficient to support a conviction "so long as a 'reasonable person could find the identification convincing beyond a reasonable doubt,' "[17] the Supreme Court has noted that "[t]he identification of strangers is proverbially untrustworthy."[18] "Even if the witness professes certainty, 'it is well recognized that the most positive eyewitness is not necessarily the most reliable.' "[19] These judicial pro-

16. At trial, April testified that she looked "[the taller man] dead in his face" and described his appearance. Her testimony was inconsistent with a statement she had given to the police in 1993, shortly after the kidnapping and murder, in which she said, "the only thing I really remember was the glasses[;] I tried not to look at [the tall man] in his face." Willie Mae Mahoney said at trial that she focused her attention on the taller man; she did not want to look at the shorter man because he had a gun. However, during cross-examination, she acknowledged that at the time when the men were in her home, she "may have thought" that both men were armed.

17. *Peterson v. United States*, 657 A.2d 756, 760 (D.C.1995) (quoting *Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988)).

18. *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *see also Wehrle v. Brooks*, 269 F.Supp. 785, 792 (W.D.N.C.1966) ("Positive identification of a person not previously known to the witness is perhaps the most fearful testimony known to

the law of evidence."), *aff'd*, 379 F.2d 288 (4th Cir.1967).

19. *Webster v. United States*, 623 A.2d 1198, 1204 n. 15 (D.C.1993) (quoting *Crawley v. United States*, 320 A.2d 309, 312 (D.C.1974)); *see also Wade*, 388 U.S. at 228, 87 S.Ct. 1926 ("The vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification."); *United States v. Stevens*, 935 F.2d 1380, 1400 (3d Cir.1991) ("That witnesses ofttimes profess considerable confidence in erroneous identifications is fairly counterintuitive."); *In re A.S.H.*, 851 A.2d 456, 459–60 (D.C.2004) (citing cases spanning five decades that cast doubt on the reliability of eyewitness identifications); *In re L.G.T.*, 735 A.2d 957, 964 (D.C.1999) (Schwelb, J., concurring *dubitante*) ("This court and other courts have repeatedly recognized the unreliability of identification of strangers made on the basis of brief observation under stressful conditions.").

nouncements are supported by research studies that have concluded that "eyewitness error is the leading cause of wrongful conviction in the United States."[20] However, "most exonerees had no successful basis for challenging what we now know to be incorrect eyewitness identifications."[21]

In this case, appellant proffered a study, conducted in 2001, in which experts on the subject of eyewitness testimony were asked whether certain observed "phenomena" were "reliable enough for psychologists to present in courtroom testimony."[22] This study sought to update one of a similar nature conducted in 1989.[23] In addition to identifying sixteen such phenomena,[24] the study revealed other important facts regarding the reliability of eyewitness testimony. First, the study identified several areas of research which experts had previously considered either unreliable or within the "common sense" knowledge of a juror. For example, in the 1989 study, the

20. ELIZABETH F. LOFTUS, JAMES M. DOYLE & JENNIFER E. DYSART, EYEWITNESS TESTIMONY: CIVIL AND CRIMINAL § 1–3, at 3 (4th ed. 1997), *cited in Strickler v. Greene*, 527 U.S. 263, 307, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

21. Brandon Garrett, *Judging Innocence*, 108 COLUM. L.REV 55, 81 (2008).

22. Saul M. Kassin, et al., *On the "General Acceptance" of Eyewitness Testimony Research: A New Survey of the Experts*, 56 AMERICAN PSYCHOLOGIST 405, 407 (2001) [hereinafter "Kassin, et al., On the 'General Acceptance'"]. In its brief on appeal, the government argued that the Kassin study has been criticized and expert testimony relying on it excluded, citing *People v. LeGrand (LeGrand I)*, 196 Misc.2d 179, 747 N.Y.S.2d 733, 744–45 (Sup.Ct.2002) (questioning the selection and size of the pool of experts surveyed), *aff'd*, 28 A.D.3d 318, 814 N.Y.S.2d 37 (App.Div.2006), *rev'd*, 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374 (2007). That judgment was subsequently reversed by the New York Court of Appeals, which bypassed the question of the adequacy of the Kassin study because "the defense expert's testimony considered sufficient studies to confirm that the principles upon which the expert based his conclusions are generally accepted by social scientists and psychologists." *People v. LeGrand (LeGrand II)*, 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374, 379 (N.Y.2007). Although we are not generally bound by the rulings in another jurisdiction, we find that the New York high court's analysis is thorough and persuasive. *See also People v. Williams*, 14 Misc.3d 571, 830 N.Y.S.2d 452, 466 (Sup.Ct.2006) (concluding that expert testimony was admissible because proffered expert rebutted challenge to Kassin study). Here, even though the expert proffered by appellant was available to testify, as we discuss *infra*, the trial court did not consider the specific proffer made, or take the opportunity to question Professor Penrod, but appeared to reject the expert testimony outright. We refer to the Kassin study not as an endorsement of its methodology, but to highlight some of the scientific research that was proffered to the trial court for its consideration.

23. *See* Saul M. Kassin, et al., *The "General Acceptance" of Psychological Research on Eyewitness Testimony: A Survey of the Experts*, 44 AM. PSYCHOLOGIST 1089 (1989) [hereinafter "Kassin, et al., The 'General Acceptance'"].

24. The sixteen were deemed sufficiently reliable to be presented to a jury, based on agreement by at least 80% of the experts surveyed. They include: (1) that the wording of questions and instructions can influence an eyewitness's testimony about events and identification, (2) that an eyewitness's confidence can be affected by factors unrelated to accuracy, (3) that exposure to mug shots increases the likelihood of that suspect being selected as the perpetrator, (4) that eyewitnesses are more accurate when identifying members of their own race, (5) that the presence of a weapon reduces the accuracy of an eyewitness's perception, (6) that an eyewitness is susceptible to inadvertently substituting the face of a person seen later for that of the actual perpetrator, and (7) that an eyewitness's confidence in an identification does not correlate with the accuracy of the identification. According to the experts surveyed, anywhere between 5 and 61% agreed that these scientific findings were within the "common sense" of lay jurors, depending on the specific finding. *See* Kassin, et al., *On the "General Acceptance," supra* note 22, at 412 tbl. 4.

surveyed experts did not agree that the methodology of studies concluding that "[t]he presence of a weapon impairs a witness's ability to accurately identify the perpetrator's face" was sufficiently sound to qualify as expert testimony.[25] By 2001, however, 87% of the experts surveyed agreed that the science concerning the effect of weapon-related stress had advanced to the point that it was reliable.[26] 34% of the experts agreed that it would be a matter of "common sense" knowledge for the average juror,[27] as compared to 11.4% in 1989.[28] Second, the 2001 study listed thirteen new areas of scientific study that were deemed reliable.[29] For example, 95% of the eyewitness experts surveyed in 2001 agreed that the scientific method behind the observed phenomenon that an eyewit-

ness's confidence can be influenced by a number of factors unrelated to accuracy is sufficiently reliable to be presented to a jury.[30] Only 10% of the experts surveyed, however, concluded that this phenomenon is within the common knowledge of lay jurors.[31]

Whether experts generally accept the scientific research on the reliability of eyewitness testimony is only part of the necessary inquiry on the admissibility of scientific evidence. Courts must also determine the extent to which expert testimony will provide information that is not likely to be known by lay jurors.[32] Trial courts, both in our jurisdiction and in others, have excluded expert testimony on eyewitness reliability because it was

---

**25.** *See* Kassin, et al., *The "General Acceptance," supra* note 23, at 1091 tbl. 1.

**26.** Studies show that most potential jurors believe that a person's memory functions like a camera, capable of retrieving a captured image on demand. *See* NATHAN R. SOBEL, EYEWITNESS IDENTIFICATION. LEGAL AND PRACTICAL PROBLEMS § 1:1, at 3 (2007–2 rev.), *cited in Reese v. Fulcomer*, 946 F.2d 247, 262 (3d Cir.1991). But memory, according to studies, is influenced by a variety of factors such as stress, including the stress induced by the presence of a weapon. LOFTUS, DOYLE & DYSART, *supra* note 20, § 2–9, at 33–34; BRIAN L. CUTLER & STEVEN PENROD, MISTAKEN IDENTIFICATION· THE EYEWITNESS, PSYCHOLOGY, AND THE LAW 101 (1995) ("[T]he presence of a weapon during a crime attracts the attention of the witness to the weapon, leaving less attention to the perpetrator's facial and physical characteristics."), *cited in Commonwealth v. Cruz*, 445 Mass. 589, 839 N.E.2d 324, 332 (2005).

**27.** *See* Kassin, et al., *On the "General Acceptance," supra* note 22, at 412 tbl. 4.

**28.** *See* Kassin, et al., *The "General Acceptance," supra* note 23, at 1094 tbl. 4.

**29.** Of the thirteen new propositions tested since the 1989 study, six were identified as presently reliable by the experts. These include:

■ that eyewitness confidence is malleable and influenced by factors unrelated to accuracy ..., [2] that exposure to mug shots of a suspect increases the likelihood of his or her selection from a subsequent lineup ..., [3] that young children are more vulnerable than adults to suggestion and other social influences ..., [4] that alcohol impairs eyewitness performance ..., [5] that eyewitnesses find it relatively difficult to identify members of a race other than their own ..., and [6] that the risk of false identification is increased by the use of a simultaneous as opposed to sequential presentation format.

Kassin, et al., *On the "General Acceptance," supra* note 22, at 410–11.

**30.** *See id.* at 412 tbl. 4; *see also* Kenneth Deffenbacher, *Eyewitness Accuracy and Confidence: Can We Infer Anything About Their Relationship?*, 4 L. HUM. BEHAV 243, 258 (1980) (cited in the defense proffer and explaining that correlation varies based upon the "processing conditions" of an identification).

**31.** *See* Kassin, et al., *On the "General Acceptance," supra* note 22, at 412 tbl. 4.

**32.** *See Frye v. United States*, 54 App.D.C. 46 46, 47, 293 F. 1013, 1014 (1923); *see also* CUTLER & PENROD. *supra* note 26, at 217.

deemed to be within the common sense knowledge, *i.e.*, "not ... beyond the ken," of the average juror.[33] Certain factors that can influence an eyewitnesses' observation and recall are familiar to lay persons. According to a majority of the experts surveyed in the Kassin study, for example, three factors—unreliability due to the susceptibility of young children to suggestion, alcohol intoxication, and cross-racial identifications—are understood by lay jurors.[34] But "jurors, as a matter of common sense, are not fully aware of the factors that influence eyewitness testimony." [35] For example, the average juror is likely to believe that witnesses remember the details of violent events better than those of nonviolent ones.[36] Scholarship on the subject, however, reveals that the opposite is true. In general, witnesses are just as likely to underestimate the dura-

tion of an event as to overestimate it, but in the case of a violent crime, however, witnesses most often think that the incident lasted longer than it did.[37] Similarly, jurors believe that the more confident a witness seems, the more accurate that witness's testimony will be.[38] Research reveals, however, that the correlation between a witness's expression of certainty in an identification and its accuracy is, at a minimum, greatly overstated, and perhaps unwarranted.[39]

Against this general background we discuss, first, the legal standard for admission of expert testimony on eyewitness identification, and then, the reasons for the trial judge's rejection of the defense proffer and its potential relevance to the identifications that were presented to the jury in this case.

33. *See, e.g., Green v. United States*, 718 A.2d 1042, 1053 (D.C.1998) (citing cases), *cert. denied, Landon v. United States*, 526 U.S. 1011, 119 S.Ct. 1156, 143 L.Ed.2d 222 (1999) (citing cases); *see also* Tanja Rapus Benton, et al., *On the Admissibility of Expert Testimony on Eyewitness Identification: A Legal and Scientific Evaluation*, 2 TENN. J.L. & POL'Y 392, 413 (2006); LOFTUS, DOYLE & DYSART, *supra* note 20, § 13–11 at 374 ("Courts that have excluded expert testimony have used a variety of formulations ... [with some holding] that expert testimony, while valid and interesting, simply tells jurors things that they already know and, therefore, fails to aid the trier of fact."); *Id.* § 13–11, at 373 n. 57 (citing cases).

34. *See* Kassin, et al., *On the "General Acceptance," supra* note 22, at 412.

35. LOFTUS, DOYLE & DYSART, *supra* note 20, § 6–5, at 130; *see also* Keith A. Findley, *Learning From Our Mistakes: A Criminal Justice Commission to Study Wrongful Convictions*, 38 CAL. W.L.REV. 333, 334 (2002) ("[H]ard evidence shows that jurors do not understand the psychological processes at work in an eyewitness identification and tend to rely an unwarranted extent on such identifications.... Nonetheless, courts in many juris-

dictions routinely continue to exclude expert testimony designed to educate jurors on these matters, often on the ground that such information is within the common knowledge of jurors or would usurp the role of the jury." (footnote omitted)); Deffenbacher, *supra* note 30, at 258 ("[T]he apparent majority of American judges, ... acting within permitted judicial discretion, do not allow expert testimony to be admitted into evidence.").

36. *See* LOFTUS, DOYLE & DYSART, *supra* note 20, § 6–6, at 130 (citing Saul M. Kassin & Kimberly A. Barndollar, *The Psychology of Eyewitness Testimony: A Comparison of Experts and Prospective Jurors*, 22 J. APPLIED SOCIAL PSYCHOLOGY 1241, 1246 (1992)).

37. *See id.*

38. *See id.* § 6–6, at 130–31 (citing Kassin & Barndollar, *supra* note 36, at 1241).

39. *See id.; see also* Noah Clements, *Flipping a Coin: A Solution for the Inherent Unreliability of Eyewitness Identification Testimony*, 40 IND. L.REV 271, 282 (2007) ("If there is one thing that the research is virtually unanimous on, it is this: there is no correlation whatsoever between eyewitness certainty and accuracy.").

## IV. The Legal Standard

■ In *Dyas* we identified three distinct criteria that trial judges must apply in considering whether to admit or exclude expert testimony regarding eyewitness identification:

> (1) the subject matter "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman;*" (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth;*" and (3) expert testimony is inadmissible "if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." [40]

The first and third *Dyas* criteria reflect the standard for admissibility of expert testimony set forth by the U.S. Court of Appeals for the District of Columbia in *Frye v. United States.* [41] *Dyas's* requirement that the evidence be "beyond the ken of the average layman," [42] derives from *Frye's* standard, that the subject matter of the expert testimony must be "such that inexperienced persons are unlikely to prove capable of forming a correct judgment," because the subject "does not lie within the range of common experience or common knowledge." [43] And the third *Dyas* requirement reflects *Frye's* standard that there be "general acceptance" of the underlying methodology in the relevant scientific community. [44]

■ Although the admission of expert testimony falls within the discretion of the trial judge, [45] we have cautioned that because the right to confront witnesses and to present a defense are constitutionally protected, "[i]n exercising its discretion, the trial court must be guided by the principles that 'the defense should be free to introduce appropriate expert testimony.' " [46] Not only is the defendant entitled

---

**40.** *Dyas*, 376 A.2d at 832 (alteration in original) (quoting McCormick on Evidence, § 13, at 29–31 (E. Cleary, 2d ed. 1972)).

**41.** 54 App.D.C. at 46, 293 F. at 1014.

**42.** *Dyas*, 376 A.2d at 832.

**43.** *Frye*, 54 App.D.C. at 47, 293 F. at 1014.

**44.** *Id.* at 47, 293 F. at 1014; *see Ibn–Tamas v. United States*, 407 A.2d 626, 638 (D.C.1979) ("[S]atisfaction of the third *Dyas* criterion [involves] a determination of whether there is general acceptance of a particular scientific methodology, not an acceptance, beyond that, of particular study results based on that methodology."). In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court rejected *Frye's* requirement of "general acceptance" as a precondition to admissibility and required instead that the trial judge, acting as "gatekeeper," determine whether the proffered expert testimony is "scientific knowledge," so that "evidentiary reliability will be based upon scientific validity." *Id.* at 590 & n. 9, 113 S.Ct. 2786; *cf. People v.*

*Wesley*, 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451, 464 (1994) (Kaye, C.J., concurring) (noting that the "general acceptance" prong of the *Frye* test "emphasizes 'counting scientists' votes rather than on verifying the soundness of a scientific conclusion' ") (quoting *Jones v. United States*, 548 A.2d 35, 42 (D.C.1988)). *Daubert* has not been adopted in this jurisdiction.

**45.** *See Hager v. United States*, 856 A.2d 1143, 1147 (D.C.2004).

**46.** *Ibn–Tamas*, 407 A.2d at 632 (quoting *Fennekohl v. United States*, 354 A.2d 238, 240 (D.C.1976)); *see also Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."); *Ferensic v. Birkett*, 501 F.3d 469, 480 (6th Cir.2007) (finding error in a trial court's exclusion of expert testimony on the reliability of eyewitness identifications because the defendant had been "denied his Sixth Amendment right to present a defense").

to present a defense, but that defense should not be put at a disadvantage in the use of scientific evidence comparable to that permitted to the government. Fairness dictates a balanced judicial approach in permitting use in criminal trials of expert testimony concerning subtle psychological factors that might affect witnesses. The defense should be permitted to present expert testimony on the unreliability of eyewitness testimony in appropriate cases, just as the government is allowed in appropriate cases to introduce expert evidence to explain the failure of government witnesses to promptly identify or accuse an attacker in order to build a case for the prosecution.[47]

## V. The Defense Proffer and the Trial Court's Ruling

Two weeks before trial,[48] defense counsel filed a forty-page motion proffering the expert testimony of Professor Steven D. Penrod, Ph.D., J.D., a social psychologist and lawyer with extensive credentials in the field of eyewitness identifications. Dr. Penrod's fourteen-page *curriculum vitae* reveals that Dr. Penrod has published widely on the subject. The motion set out the evidence presented by the government at the first trial and the prosecution's exclusive dependence on the identifications by the five Mahoneys. The motion addressed each of the three criteria for admissibility established in *Dyas*, requested a hearing, and offered to make Professor Penrod available for examination. With respect to the state of scientific research on the subject, the motion stated that in the last twenty-five years "psychologists have made great strides in understanding the factors that lead to accurate and inaccurate eyewitness identification." The proffer pointed to the 2001 Kassin survey discussed above, which indicates that certain findings "are generally well accepted by experts," and to the increasing acceptance of such findings by law enforcement, with specific reference to the Department of Justice's publication, Eyewitness Evidence.[49] In addressing whether the subject matter of the proffered expert testimony was "beyond the ken" of the average juror, the defense asserted that while many trial judges are "educated ... in the many problems inherent in eyewitness testimony," this is "not generally understood by the average member of the public."

---

**47.** See, e.g., *Nixon v. United States*, 728 A.2d 582, 589 (D.C.1999) (approving use of expert testimony on Battered Women Syndrome), *cert. denied*, 528 U.S. 1098, 120 S.Ct. 841, 145 L.Ed.2d 707 (2000); *Oliver v. United States*, 711 A.2d 70, 73 (D.C.1998) (permitting expert testimony on behavioral characteristics and psychological dynamics of sexually-abused children); *see also Blakeney v. United States*, 653 A.2d 365, 369 (D.C.1995) (permitting expert testimony on habits of drug traffickers).

**48.** Defense counsel again moved for the admission of expert testimony mid trial, noting the government's emphasis on the witnesses' "certainty" in their identification of appellant.

**49.** In 1999, then-Attorney General Janet Reno commissioned an investigation into the first twenty-eight cases of persons who were convicted and were later exonerated by DNA evidence. This study documented the reality of wrongful convictions that had been based on erroneous eyewitness identification. *See generally* NATIONAL INSTITUTE OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, U.S. DEPT. OF JUSTICE EYEWITNESS EVIDENCE· A GUIDE FOR LAW ENFORCEMENT (1999) [hereinafter EYEWITNESS EVIDENCE]. The resulting report fueled an expansion in the research into eyewitness reliability, and led the Attorney General to conclude that: "Even the most honest and objective people can make mistakes in recalling and interpreting a witnessed event; it is the nature of human memory." *Id.* at iii. A more recent study, of the first two hundred persons exonerated by DNA evidence, disclosed that in 79% of the cases there had been at least one erroneous eyewitness identification. *See* Garrett, *supra* note 21, at 60. In 28% of these cases, the victim's erroneous identification was the central evidence supporting conviction. *See id.* at 79.

Appellant's motion outlined the substance of Professor Penrod's proposed testimony, which included "a description of the various research studies and experiments upon which his conclusions would be based," and stated "that controlled experiments have led him and other experts in the field to draw [a number] of general conclusions" about the reliability—or lack thereof—of eyewitness identification when certain specific factors are present. Eleven specific factors were set out and explained in the motion.[50] These included, *inter alia*, the unreliability of identifications from observation made under stress-

ful circumstances, such as when a witness is focused on the presence of a weapon; the lack of correlation between witness confidence and accuracy; the influence of knowing that others have identified the same suspect;[51] and the use of "unreliable investigative procedures," including photo arrays, that can affect eyewitness reliability.[52] The motion also asserted that these findings are not known to lay jurors, and, more specifically, that the lack of correlation between an eyewitness's confidence in an identification and the accuracy of that identification is not only unknown to lay persons, but is also "counterintuitive."[53]

**50.** The factors included: (1) "[a] high level of stress and emotional arousal at the time of the eyewitness' observations may make the eyewitness less likely to retain an accurate memory and perception of details of an event"; (2) "[a] brief period of interaction decreases an eyewitness' ability to perceive and remember accurately the details of an assailant's physical appearance"; (3) "[t]he presence of a weapon, ... causes the witness not to pay close attention to how the assailant actually appears"; (4) "general[ly], the level of an eyewitness' confidence is only modestly correlated to the likelihood that the eyewitness' identification is accurate"; (5) "[a] witness may over time become increasingly confident in the accuracy of his [or her] identification ... ha[ving] no correlation whatsoever to the likelihood that the eyewitness' identification is accurate"; (6) "subjects are susceptible to suggestion in making their eyewitness identifications"; (7) "[t]he absence at show-ups or in photographic arrays of any 'foils'—non-suspects who resemble descriptions given previously by the eyewitness—increases the likelihood that an eyewitness will, for lack of any choice of comparison, incorrectly identify ... one of the persons present in the line-up or array"; (8) "[w]itnesses readily incorporate suggestions from others into their memory for events"; (9) "[t]he passage of time between the incident [and] the identification procedure has a marked effect on the accuracy of a subsequent identification"; (10) "knowing that someone else positively identified the same suspect has also been found to inflate individuals' confidence in their identifications"; and (11) "[t]he type of identification procedures used by police officers, and the

way the police conduct those procedures, has a significant impact on the accuracy of the identifications produced by those procedures."

**51.** *See* Amy L. Bradfield, Gary L. Wells & Elizabeth A. Olson, *The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy*, 87 J. Applied Psychology 112, 117 (2002), *cited in State v. Ledbetter*, 275 Conn. 534, 881 A.2d 290, 312 (2005).

**52.** For example, U.S. Department of Justice guidelines explain that prior to conducting a photo array, an eyewitness should be instructed "that the person who committed the crime may or may not be present," Eyewitness Evidence, *supra* note 49, at 19; *see also* Gary L. Wells & Elizabeth Loftus, *Eyewitness Memory for People and Events*, in 11 Handbook of Psychology 157–58 (A.M. Goldstein, ed. 2003) ("[F]ailure to give explicit instructions to the eyewitness that emphasize that the perpetrator might *not* be in the lineup leads eyewitnesses to pick someone from the lineup at very high rates regardless of whether the perpetrator is present."), that they should "not ... discuss the identification procedure or its results with other witnesses involved in the case," Eyewitness Evidence, *supra* note 49, at 34, and caution that "investigator's unintentional cues (e.g., body language, tone of voice) may negatively impeach the reliability of eyewitness evidence." *Id.* at 9.

**53.** In the motion, counsel also asserted that Professor Penrod's testimony was important to show that the government had failed to conduct a reliable and thorough investigation,

In its opposition, the government did not challenge Professor Penrod's qualifications. The prosecutor did not proffer its own expert offering a contrary position, arguing that, because the motion was filed shortly before trial, it did not have sufficient time to formulate a substantive response. Instead, the government argued that this court had in the past upheld the exclusion of similar expert evidence, citing *Dyas*,[54] and our earliest cases on the subject, *Smith v. United States*,[55] *Brooks v. United States*,[56] and *Taylor v. United States*.[57] The government dismissed the claim made in the proffer that research in the field had "progressed so profoundly" that it should be considered anew, citing our affirmance in *Green*, a case in which testimony by the same expert, Professor Penrod, had been proffered as an expert witness as recently as 1998, but had been excluded.

At the hearing on the defense motion, the trial court initially asked counsel for "the score" in terms "of which [trial] judges ... allow[ ] this and who doesn't," and opined that "[i]t's largely in favor of not allowing it."[58] The trial court accepted Professor Penrod's qualifications, ("Dr. Penrod's credentials look excellent. And I'm sure that he would qualify as he has in other jurisdictions."), but questioned the substance of Dr. Penrod's proffered testimony. Referring to the proffered opinion

regarding the untrustworthiness of stranger identifications, the trial court commented:

> That seems one of the ... to be one of these revealed truths in the law that somebody said about 100 years ago and it's picked up in opinion after opinion after opinion. And we don't know that that's so. I don't know that that's so. And I don't know that Penrod knows that it's so either.
>
> * * *
>
> I'm not convinced in any way when an appellate court says stranger-to-stranger identification has some danger of misidentification.... I don't know why they are in any position to make that statement case after case, year after year, century after century, if you will.

In addition to questioning the expert's scientific opinion, the trial judge concluded that the expert testimony would not be of assistance to the jury because "[t]he identification of persons by other persons ... [is] something we do all the time. It is not an esoteric matter for everybody.... I don't really believe that this type of—what this expert would testify to is beyond the ken of normal jurors." The trial court seemed particularly convinced that the number of eyewitnesses in the case made the proffered expert dispensable. "[W]hen [w]e have five eyewitnesses, and

---

invoking the right to present such a defense as enunciated in *Kyles v. Whitley*, 514 U.S. 419, 445, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), *Greer v. United States*, 697 A.2d 1207, 1209–11 (D.C.1997), and *Allen v. United States*, 603 A.2d 1219, 1222–23 (D.C.), *cert. denied*, 505 U.S. 1227, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992). This argument is not raised on appeal.

**54.** 376 A.2d at 832.

**55.** 389 A.2d 1356 (D.C.1978).

**56.** 448 A.2d 253 (D.C.1982).

**57.** 451 A.2d 859 (D.C.1982).

**58.** According to the prosecutor, of the judges on the Superior Court of the District of Columbia, "only one" has allowed expert evidence on eyewitness identifications. Appellant's proffer referred to two cases in which Superior Court judges had permitted such expert testimony; one of the judges has since been serving on the U.S. District Court for the District of Columbia. We do not know whether this information was (or is) correct. As we discuss *infra*, although the statistic may be of interest, it cannot be dispositive on the question of admissibility in a particular case.

apparently that's what we have in this case, who positively identify somebody, you feel much more confident about the accuracy of the overall identification process than you do if its only one witness." The trial judge concluded,

> And that does not mean that they [the jurors] will get it right every time. I think we all know that this is an imperfect system that doesn't always come up with the right verdict in civil and criminal cases. But I am not at all concerned that the testimony of Dr. Penrod or anybody like him would make it more likely that a jury would come up with the right decision in this case or in any case.

The trial court denied the defense motion to call Dr. Penrod, the case went to trial, and appellant was convicted on the strength of the Mahoneys' identifications.

## VI. Analysis

 Whether to admit expert testimony is committed to the discretion of the trial court; "a ruling either admitting or excluding such evidence will not be disturbed unless manifestly erroneous"—*i.e.,* for abuse of discretion.[59] When an evidentiary question is committed to the discretion of the trial judge, as here, our review on appeal is limited to whether the judge engaged in a proper exercise of discretion. As we have said on many occasions, the exercise of discretion entails, first, recognition that there is discretion to be exercised, and then, after consideration of the correct legal factors, their reasonable application to the facts of the case before the court.[60] For the reasons that follow, we conclude that in this case the trial court applied incorrect legal principles, and did not fully consider the proffer presented

under the three-part analysis we set forth in *Dyas*. Because of the potential importance of the proffered expert testimony, that was grounded exclusively on eyewitness identification, we are constrained to remand so that the trial court may reconsider appellant's proffer in light of the correct legal factors and the evidence presented at trial.

 First, in excluding the expert evidence, the trial judge did not explicitly consider the three *Dyas* factors—or indeed, any one of them—in light of the specific and detailed proffer made by defense counsel. Rather, the court appears to have excluded the expert evidence at least in part based on an *a priori* belief that the untrustworthiness of eyewitness identification is "one of those revealed truths in the law that somebody said about 100 years ago ... And we don't know that that's so." This view was encouraged by the prosecutor's argument, made during the motions hearing, that "there's never a case where the type of expert testimony [appellant] is seeking to introduce is appropriate because it would usurp the very gut of what the jurors are here to do." Both statements are categorical and reflect a lack of attention to the specific proffer made by defense counsel and its potential relevance to the eyewitness identifications in this particular case. These statements not only overlook the substance of the proffered expert testimony, but also miss the critical role of the judge in evaluating its admissibility. As we emphasized in *Green*, the decision to admit or exclude expert testimony must be made on a case-by-case basis, grounded on the proffer made and on its potential to assist the jury in the particular case before the court.[61]

**59.** *Hager,* 856 A.2d at 1147 (quoting *Green,* 718 A.2d at 1050).

**60.** *See Johnson v. United States,* 398 A.2d 354, 361 (D.C.1979).

**61.** 718 A.2d at 1051.

Moreover, to the extent that the trial court expressed disagreement with the substance of the proffered scientific testimony, we note that what *Frye* and *Dyas* require is acceptance within the scientific community of the methodology used, rather than judicial agreement with specific results.[62]

■■■ We emphasize our disagreement with the prosecutor's statement that expert testimony on eyewitness identification is "*never* . . . appropriate because it would usurp" the jury's function.[63] If expert testimony can assist the jury, it perforce does not usurp the jury's function. Rather, it enhances the jury's ability to perform its role as factfinder.[64] The jury's responsibility in a criminal case is to criti-

cally examine the government's evidence against the most exacting legal standard, guilt beyond a reasonable doubt. This standard "requires the factfinder to 'reach a subjective state of near certitude of the guilt of the accused.' "[65] According to some scholars, "evidence of identification, however untrustworthy, is taken by the average jur[or] as *absolute proof*."[66] Expert testimony can therefore be critical in helping to confirm—or undermine—a juror's "near certitude" of a defendant's guilt when the prosecution's case is grounded on the identification of eyewitnesses, and in furthering the truth-seeking purpose of a trial.

■■■ In construing and applying Federal Rule of Evidence 702 concerning "sci-

---

62. *See Ibn–Tamas*, 407 A.2d at 638; *see also United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir.1986) ("The scientific validity of the studies confirming the many weaknesses of eyewitness identification cannot be seriously questioned at this point.") (quoting Abney, *Expert Testimony and Eyewitness Identification*, 91 CASE & COMMENT 26, 29 (Mar./Apr. 1986)). Under the more relaxed *Daubert* standard, the judicial role also is limited to assessing the reliability of the proffered evidence, and it is not the function of the judge to take issue with the substance of research findings that are determined to be reliable. *See* 509 U.S. at 593–94, 113 S.Ct. 2786 (pointing to factors that might be considered by trial judges: whether a theory or technique is *testable and has been tested*; whether it has been subject to peer review and publication; the rate of error of the specific scientific technique; the existence of standards controlling the technique employed; and the degree of acceptance within the scientific community).

63. (emphasis added).

64. *See* 7 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1920, at 18 (Chadbourn rev. 1978) ("A phrase often put forward as explaining why the testimony we are concerned with is excluded, declares that the witness, if allowed to express his 'opinion,' would be 'usurping the functions of the jury.' . . . [T]he phrase is so misleading, as well as

unsound, that it should be entirely repudiated. It is a mere bit of rhetoric." (footnotes omitted)); *see also United States v. Downing*, 753 F.2d 1224, 1226 (3d Cir.1985) ("[Federal Rule of Evidence 704] rejects as 'empty rhetoric' the notion that some testimony is inadmissible because it usurps the 'province of the jury.' " (quoting WIGMORE. *supra*, § 1920, at 17)); *People v. Jones*, 73 N.Y.2d 427, 541 N.Y.S.2d 340, 539 N.E.2d 96, 98 (1989) ("Expert opinion testimony is used in partial substitution for the jury's otherwise exclusive province which is to draw 'conclusions from the facts.' It is a kind of authorized encroachment in that respect.") (quoting *People v. Cronin*, 60 N.Y.2d 430, 470 N.Y.S.2d 110, 458 N.E.2d 351, 352 (1983)).

65. *Rivas v. United States*, 783 A.2d 125, 133 (D.C.2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

66. John C. Brigham & Robert K. Bothwell, *The Ability of Prospective Jurors to Estimate the Accuracy of Eyewitness Identifications*, 7 L. & HUM. BEHAV. 19, 20 (1983); *see also* LOFTUS, DOYLE & DYSART, *supra* note 20, § 6–2, at 124 ("Although sometimes attempts to discredit the eyewitness succeed in making the eyewitness less persuasive than one who is unimpeached, generally even discredited eyewitness testimony carries some weight.").

entific, technical, or other specialized knowledge," the Supreme Court has remarked on the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.'"[67] The Court advised that judges should rely on the adversary system, rather than on the exclusion of evidence, to guard against potential juror confusion from the presentation of scientific evidence, noting that "[v]igororous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[68] Any remaining concern a trial judge may have that admission of expert testimony could confuse or overwhelm the jury is more appropriately dealt with, not by exclusion, but by placing reasonable limitations on the expert's testimony and instructing the jurors that they—and only they—are the ultimate fact finders.

To the extent that the trial court excluded the proffered expert testimony based on what "most" other judges do, or because, as the government urged, that expert testimony questioning eyewitness identification is "never" helpful to the jury, it was error to fail to exercise discretion.[69]

But even if the trial court did not apply an automatic rule of exclusion,[70] the ruling was nonetheless defective because it did not address the correct legal factors set out in *Dyas* or apply them to the expert testimony that the defense proffered.

In cases raising this issue to date, we have upheld the trial court's decision to exclude expert testimony on factors that may affect the reliability of eyewitness identifications. In *Dyas*, we affirmed the exclusion of expert evidence regarding the effects of stress, lapse of time, suggestion by persons in authority and a prior identification by the witness, after the trial court found that such expert evidence was not "beyond the ken of the average layman" and would not assist the jury. We noted that counsel had the opportunity to "fully explore [the witness's] perception and recollection" of an armed robbery.[71] Shortly after *Dyas*, in two cases, we summarily upheld the exclusion of scientific evidence that was "akin" or "similar" to that proffered in *Dyas*.[72] In *Smith*, for example, the court emphasized that counsel had "ample opportunity to test the reliability of the complainant's identification through vigorous cross-examination."[73] In 1982, the court decided two appeals, *Brooks* and *Taylor*, which also raised the use of expert

---

**67.** *Daubert*, 509 U.S. at 588, 113 S.Ct. 2786 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)).

**68.** *Id.* at 596, 113 S.Ct. 2786.

**69.** *Johnson*, 398 A.2d at 364 (application of a general rule to all cases without regard to facts before the court is an abuse of discretion).

**70.** We are aware that the trial judge said that this was "the first time I've ever had a motion like this.... And I don't want to be construed as saying I would never allow it. But I don't think this is the right case."

**71.** 376 A.2d at 832.

**72.** *See Jackson v. United States*, 420 A.2d 1202, 1203 n. 2 (D.C.1979) (en banc) (upholding, in a footnote, exclusion of the "proffered expert psychological testimony on eyewitness identifications," where trial court concluded proffer was "akin" to that rejected in *Dyas* and therefore "not ... a proper subject for expert testimony"); *Smith*, 389 A.2d at 1358–59 (upholding, in a *per curiam* opinion, exclusion of expert evidence "on the psychological principles underlying eyewitness identification," where trial court had concluded that the proffer was "similar to the evidence offered [in *Dyas*,]" and therefore was inadmissible).

**73.** *Smith*, 389 A.2d at 1358.

testimony in eyewitness identification cases. In *Brooks,* we upheld exclusion of expert evidence on "the nature of human memory and perception and the mental processes involved in an eyewitness's identification," where the trial court had determined that the proffered testimony was not "beyond the ken of jurors in the District of Columbia," because through cross-examination counsel had been given the "opportunity to fully explore each victim's perception and recollection of the assault and her ability to identify the assailant." [74] In *Taylor,* we also affirmed the exclusion of expert evidence "on the subject of the nature of human memory and perception and mental processes involved in an eyewitness identification," where the trial court had concluded that "[t]here is no reason to believe that the jurors were incapable of properly evaluating the evidence by using their experience and common sense, in lieu of expert elucidation." [75]

In *Green,* decided in 1998, we upheld the trial court's exclusion of expert evidence after it determined that "the proffered expert testimony did not deal with subject matter beyond the ken of the average juror and would present information unnecessary to this particular jury that would be hearing the case." [76] There, the defendant proffered expert evidence regarding "unconscious transference"; "photo-biased identifications"; "the negative effects of stress, fear, and emotion[,] . . . of violence or the use of a weapon[,] . . . [and] lighting conditions and brief periods of interaction between an eyewitness and a perpetrator

on the accuracy of the eyewitness's memory"; and the "reluctance of an eyewitness who has publicly identified someone to change that identification later, or even to admit doubt." [77] We noted that the trial court had observed that during the first trial, counsel's cross-examination had been so effective that the eyewitness had been made to look "silly" in front of the jury.[78] Deferring to the trial court's "lengthy . . . ruling" (quoted in full in the appellate opinion),[79] we affirmed.[80] More recently, in *Hager,* decided in 2004, we upheld the exclusion of expert evidence "concerning the correlation between witness confidence and accuracy in eyewitness identifications," [81] because it was irrelevant, pointing out that the studies relied on by the proffered expert concerned "stranger identification [and] not an identification of a person known to the witness, as in this case." [82] And last year, in *Burgess v. United States,*[83] we affirmed after the trial court excluded expert evidence "on the psychological factors of memory and perception that affect the accuracy of eyewitness identifications especially when it involves cross-racial identifications." [84] We ruled on the insufficiency of the proffer, for the defendant had "failed to identify his expert witness, the expert's qualifications, and the particular opinions to be rendered." [85]

 While we will defer to the trial court's exclusion of expert testimony when it is based on a reasoned and reasonable exercise of discretion, automatic reliance

**74.** 448 A.2d at 258.

**75.** 451 A.2d at 866–67.

**76.** 718 A.2d at 1050, 1053.

**77.** *Id.* at 1051–52.

**78.** *Id.* at 1052.

**79.** *Id.* at 1053.

**80.** *See id.* at 1053.

**81.** 856 A.2d at 1147.

**82.** *Id.* at 1149.

**83.** 953 A.2d 1055 (D.C.2008).

**84.** *Id.* at 1056.

**85.** *Id.* at 1063.

on *Dyas* or on other past cases to exclude expert evidence will not suffice, except in clear-cut cases. As we explained in *Ibn–Tamas,*

> [A]lthough a trial court's ruling to exclude expert testimony is reversible only for abuse of discretion—for being "manifestly erroneous,"—there is an important tradeoff for giving the trial court such latitude: that court must take no shortcuts; it must exercise its discretion with reference to *all* the necessary criteria. Otherwise, the very reason for such deference—i.e., the trial court's opportunity to observe, hear, and otherwise evaluate the witness—will be compromised. Thus, the appellate court must not affirm a ruling premised on trial court discretion unless the record clearly manifests either (1) that the trial court has ruled on each essential criterion, or (2) that the trial court, as a matter of law, had "but one option." [86]

▆▆▆ As we have expressly stated in our more recent cases, "*Dyas* and its progeny do not articulate a *per se* requirement that all expert testimony about the reliability of eyewitness identification must be excluded." [87] Moreover, we have taken note of the fact-supported by the studies discussed above—that the "art of the inquiry or the scientific methodology governing the psychological study of eyewitness identification, including cross-racial identification, and also pertinent case law in other jurisdictions, reflect new developments since our 1977 *Dyas* decision, and hence, the first *Dyas* factor may require more than cursory scrutiny today." [88]

Here, the trial court appears to have overlooked the more recent studies, mentioned in the proffer, which were published *after* the cases relied upon by the government in opposing the defense motion. Consistent with the studies we have discussed here, we have observed that "[d]espite the fact that jurors may be familiar from their own experience with factors relevant to the reliability of eyewitness observation and identification, ... it cannot be said that psychological studies regarding the accuracy of an identification are within the ken of the typical juror." [89] This, too, was mentioned in the proffer. The trial court here expressed a contrary view, stating that eyewitness identifications are a common experience and "not an esoteric matter for everybody." But the proffer—not adverted to by the court—was precisely that scientific research had both identified factors that may lead· a jury to question an eyewitness identification *and* that some of these factors are not evident to lay jurors. Indeed, with respect to the correlation between confidence and accuracy of an identification, the proffer noted that the scientific research findings are counterintuitive. Careful consideration of the proffer and, as suggested by defense counsel, a *voir dire* examination of Professor Penrod, would have provided the trial judge with evidence on which to make a determination whether the research underlying the findings Dr. Penrod proposed to present is generally accepted in the relevant scientific community and beyond the ken of most lay persons. Without such an inquiry and factual determination, the trial court is not free to

---

86. 407 A.2d at 635 (internal citations omitted) (quoting *Douglas v. United States,* 386 A.2d 289, 295 (D.C.1978); *Johnson,* 398 A.2d at 363–67).

87. *Green,* 718 A.2d at 1051.

88. *Burgess,* 953 A.2d at 1063 n. 12; *see* Jules Epstein, *The Great Engine That Couldn't: Sci-*

*ence, Mistaken Identifications, and the Limits of Cross–Examination,* 36 STETSON L.REV. 727, 735–36 (2007) ("[O]ver a thirty-year period, the study of eyewitness perception, memory, and recall exploded.").

89. *Hager,* 856 A.2d at 1147 (quoting *People v. Lee,* 96 N.Y.2d 157, 726 N.Y.S.2d 361, 750 N.E.2d 63, 66 (2001)).

disregard this court's expressed views on the subject.[90]

▮▮▮▮ We reiterate, as we said in *Green*, that while the determination whether to admit expert testimony regarding eyewitness reliability lies within the discretion of the trial judge, this determination must be based upon a consideration of each of the three separate criteria identified in *Dyas*, taking into account "the particular proffer made and in the concrete setting of that case."[91] In short, the court's determination must be case-specific, based on the proffered expert testimony, and must consider: (1) the current state of generally-accepted scientific research; (2) whether it is within the common knowledge of lay jurors; and (3) whether the testimony would assist the jury, taking into account the relevance and probative value of the proposed scientific evidence to the eyewitness identification in the case. Because the record in this case does not show that the trial court gave such individualized consideration to the proffer made by the defense, we remand the case so that the judge may do so.

We do not purport to conduct on appeal the deliberate consideration of the proffer, in the context of the eyewitness identifications in this case, that the trial judge must conduct. But because the issue is an important one that continues to be raised on appeal with some frequency, and is likely to continue to arise because of the pace of scientific research, we make some general observations. First, is the fairly obvious fact, gleaned from experience, that a theory, initially untested, unrecognized, and unsupported by evidence, over time might receive widespread recognition and the support of experts in the respective field of social science research. Courts have taken cognizance of such developments in social science, which has led to changes in the law of evidence.[92] The state of social science research with respect to the reliability of eyewitness testimony has developed in recent years to the point where it can credibly be argued by defense counsel that it has reached that critical juncture. Whereas once we could only speculate as to the inaccuracy of an eyewitness identification, now there is published scientific research that questions its accuracy when made under certain conditions and exonerations, based on DNA evidence, that con-

---

90. Provided that the ruling is on point and recent enough to reflect current scientific knowledge, prior rulings on specific proffers of scientific evidence are binding. *See, e.g., Mindombe*, 795 A.2d at 42 ("[T]his court has previously recognized that expert testimony involving 'the behavioral characteristics of child molestation victims, … [and] the psychological dynamics of a victim of child sexual abuse are beyond the ken of the average juror.'") (alteration in original) (quoting *Oliver*, 711 A.2d at 73 (internal quotation marks omitted)). The provisos are all-important, however, as different factual settings as well as scientific developments may require that the court consider afresh whether a particular proffer meets the *Dyas* standard. On this record, we have no reason to doubt the observation we made in *Hager* in 2004, that jurors generally lack knowledge about psychological studies regarding the accuracy of identifica-

tions. *See* 856 A.2d at 1147. The more recent studies we discuss earlier confirm it.

91. *Green*, 718 A.2d at 1051; *cf. id.* at 1052 (quoting trial judge as saying, "So I am not making this ruling without some cognizance of basically what is out there [in terms of scientific research], but rather I am making this ruling based upon my conclusion that this proffered testimony and evidence do not meet the first prong of the *Dyas* three-prong test").

92. *See, e.g., Nixon*, 728 A.2d at 589 (approving the use of expert testimony on the subject of Battered Women Syndrome); *Oliver*, 711 A.2d at 73 (permitting expert testimony on effects of child sexual abuse on recollection); *cf. Frye*, 54 App.D.C. at 47, 293 F. at 1014 (rejecting "systolic blood pressure deception test" because it had not gained general acceptance).

firm what previously were only suspicions.[93]

Second, not all expert testimony concerning the potential unreliability of eyewitness identification is the same, or necessarily relevant, to a case even if the government's evidence includes identifications made by eyewitnesses. As we have discussed, there are particular factors that affect eyewitness reliability to a greater or lesser degree, and not all are present in every case in which an eyewitness has identified the defendant. Moreover, some, but not all, of these factors are understood by lay jurors.

▮▮▮▮ It is quintessentially the function of the trial judge to determine whether expert testimony is likely to be helpful to the jury in evaluating the identification presented in a particular case, once having ascertained that the expert is qualified, and that the science is generally accepted and not within the common knowledge of jurors.[94] In making that determination, a trial judge must consider whether expert testimony is the only means, or a particularly effective way, to address and correct common juror misconceptions about the reliability of the eyewitness identifications in the case. Thus, as we have previously recognized, there are certain cases where cross-examination may suffice to test the reliability of the identification made by an eyewitness.[95] Many judges rely on cross-examination as an effective way to expose weakness in an eyewitness identification, but reliance on cross-examination cannot be automatic or reflexively adopted in lieu of proffered expert testimony. Simply put, the information that an expert can provide about research studies is different in nature and cannot be elicited from a lay witness during cross-examination. Moreover, studies show that exclusive reliance on cross-examination may be unfounded, for

> in the absence of expert testimony, witnessing and identification conditions had negligible effects on juror inferences about the eyewitness, the strength of

---

93. *See supra* note 21. One example is the well-known case of Jennifer Thompson who, in court, identified Ronald Cotton as the man she believed had raped her and who was subsequently convicted of the crime. After serving more than eleven years in prison, Cotton was exonerated by DNA evidence. *See generally* JENNIFER THOMPSON-CANNINO & RONALD COTTON, PICKING COTTON OUR MEMOIR OF INJUSTICE AND REDEMPTION (2009). In Thompson's words:

> The man I was so sure I had never seen in my life was the man who was inches from my throat, who raped me, who hurt me, who took my spirit away, who robbed me of my soul. And the man I had identified so emphatically on so many occasions was absolutely innocent.

Jennifer Thompson, Editorial, *'I was Certain, but I was Wrong'*, N.Y. TIMES, June 18, 2000, at A15, available at http://www.nytimes.com/2000/06/18/opinion/i-was-certain-but-i-was-wrong.html.

94. *See Hager*, 856 A.2d at 1147 ("[I]n a jury trial the judge must exercise discretion to decide whether the proffered expert testimony is likely to assist the jury in the performance of its duties—that is to say, in understanding the evidence, determining the facts that must be found and rendering its verdict.") (internal quotation marks omitted) (quoting *Steele*, 854 A.2d at 181).

95. *See Green*, 718 A.2d at 1052 (noting comment by trial judge that counsel for the defense "left nothing unturned in cross examining [the eyewitness,]" that "there was nothing else [defense counsel] could have asked him about his identifications," and that "in some respects [defense counsel] made [the eyewitness] out to be silly in front of the jury, through the quality of . . . cross-examination"). *See generally* Christopher M. Walters, Comment, *Admission of Expert Testimony on Eyewitness Identification*, 73 CALIF.L.REV. 1402, 1403 (1985) ("[R]equirements of corroboration, cross-examination, and jury instructions have often been proposed as alternative remedies to expert testimony on eyewitness reliability.").

defense and prosecution cases, or on juror decisions. In short, without the benefit of expert testimony, jurors did not make even minimal use of their purported knowledge of eyewitnessing factors and relied heavily on witness confidence in forming their judgments.[96]

In short, while cross-examination is an attractive option because it is familiar to judges and less time-consuming than determining the qualification of experts and resolving challenges and objections that admission of expert scientific evidence can entail, it is not necessarily a satisfactory alternative; the efficacy of cross-examination must be evaluated with care in the context of the particular case and against the value added to the jury of proffered expert testimony. There is no one-size-fits-all solution.

We remand the case so that the trial judge may properly consider the expert testimony proffered by the defense in the context of the facts of this case.[97] We do not hold that the trial judge, after exercising his discretion applying the three *Dyas* criteria, may not properly exclude the ex-pert testimony.[98] But failure to exercise discretion upon careful consideration of the proffer in light of the *Dyas* factors was error as a matter of law.[99]

## VII. Remand

It bears explaining why this appeal—for the first time in our court-requires a remand for further proceedings, while *Hager* and *Green*, our most recent cases in which we reviewed the trial court's exclusion of expert testimony on the ground that it would not assist the jury, did not. First, Hager proffered testimony on the unreliability of stranger identifications, but none of the eyewitnesses who identified Hager was a stranger to him. This meant that the expert testimony was irrelevant and therefore could not aid the jury and might, in fact, confuse it.[100] Second, the case against Hager featured physical evidence that corroborated the eyewitnesses' identification.[101] "[W]here such corroboration of identification exists, the exclusion of the proffered expert testimony by the trial court generally does not constitute an abuse of discretion." [102] The case against appellant, by contrast, was based on identi-

96. Steven Penrod & Brian Cutler, *Witness Confidence and Witness Accuracy: Assessing Their Forensic Relation*, 1 Psychology, Pub. Pol'y & L. 817, 840 (1995), *cited in State v. Guzman*, 133 P.3d 363, 370 (Utah 2006) (Durham, C.J., concurring).

97. *See Downing*, 753 F.2d at 1226 (remanding for further consideration where trial court "refused to admit the testimony of a psychologist offered by the defendant, apparently because the court believed that such testimony can never meet the [requisite] 'helpfulness' standard of [the Federal Rules of Evidence]").

98. We note that after the remand ordered by the appellate court in *Downing, id.*, the District Court, after further proceedings, excluded the expert testimony because of a "weak fit" between the proffered scientific testimony and the disputed identification in the case. *United States v. Downing*, 609 F.Supp. 784, 792 (E.D.Pa.), *aff'd mem.*, 780 F.2d 1017 (3d Cir.1985).

99. Although this opinion for the court and the concurrence may differ in style and emphasis, we perceive no substantive difference in-and take no issue with-the core points made by our concurring colleague as to why a remand is required.

100. *See Hager*, 856 A.2d at 1149.

101. We are aware of no published opinion of this court, since our decision in *Brooks* twenty-seven years ago, affirming the exclusion of expert testimony on eyewitness identifications in a case in which the only evidence presented against the defendant was the identification of eyewitnesses who did not know the defendant.

102. *Hager*, 856 A.2d at 1149; *see United States v. Blade*, 811 F.2d 461, 465 (8th Cir. 1987) (no error in excluding expert witness identification testimony, where multiple eyewitness identifications were presented and were corroborated by the presence of the de-

fications made by strangers that corroborated each other, but is bereft of any other corroborative evidence. Similarly, in *Green* (and unlike in this case) the government presented corroborating physical evidence, appellant's jacket found with the murder victim's property and appellant's fingerprints in the getaway car.[103] Also unlike in this case, the trial judge who excluded the scientific evidence in *Green* as unnecessary to test the credibility of the eyewitness, had been able to personally assess the efficacy of cross-examination and how it had undermined the eyewitness on the stand during the first trial.[104] Here, different judges presided over appellant's two trials, so that, in rejecting the proffered expert testimony prior to the second trial, the judge did not have a basis of personal observation of the witnesses' testimony to conclude that expert testimo-

ny would not assist the jury to an appreciable extent.

■ We agree with the trial court that expert testimony is likely to be more critical where only one eyewitness (who is a stranger) identifies the defendant as the perpetrator. But we must disagree, as have other courts, with the notion propounded by the government that expert testimony of the type proffered here is probative, if at all, *only* in cases in which a single witness has identified the defendant.[105]

■ The trial court expressed "feel[ing] much more confident about the accuracy of the overall identification process" in this case because five eyewitnesses who identified appellant as "the taller" of the two men who kidnapped Sean Williams.[106] However, as we said following

---

fendant's identification both in the suspect vehicle and in a jacket found in the path of flight of the driver); *United States v. Smith*, 736 F.2d 1103, 1107–08 (6th Cir.1984) (no error in excluding expert on eyewitness identifications where multiple eyewitness identifications were presented and physical evidence—the defendant's palm print at robbery site—discredited appellant's alibi).

**103.** *See* 718 A.2d at 1048.

**104.** *Id.* at 1052.

**105.** *See Ferensic*, 501 F.3d at 482 ("The significance of [the proffered expert's] testimony cannot be overstated. Without it, the jury had no basis beyond defense counsel's word to suspect the inherent unreliability of the [two eyewitnesses'] identifications."); *Downing*, 753 F.2d at 1227 (remanding for further consideration of expert witness testimony on unreliability of eyewitness identifications because exclusion not harmless where "[t]he government's case against appellant consisted primarily of the testimony of *twelve* eyewitnesses who, with varying degrees of confidence, testified that appellant was the [perpetrator]" (emphasis added)); *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 726 (1984) (reversing conviction where "in the testimony of each of the

witnesses who identified defendant in the courtroom there were elements that could have raised reasonable doubts as to the accuracy of the identification," there was no other corroborating evidence, and defendant presented alibi witnesses), *overruled in part by People v. Mendoza*, 23 Cal.4th 896, 98 Cal. Rptr.2d 431, 4 P.3d 265 (2000) (overruling *McDonald* to the extent that it stated, in *dictum*, that a jury must specify the degree of murder to which it assigned guilt). *But see United States v. Smith*, 156 F.3d 1046, 1053–54 (10th Cir.1998) (no error in refusing to permit testimony of an expert on the unreliability of eyewitness identifications where there were five such identifications, appellant changed his alibi, and the case was "admittedly close").

**106.** Our standard instructions recognize that quantity does not necessarily equal quality. Civil Pattern Jury Instruction 2.13 provides:

The weight of the evidence is not necessarily determined by the number of witnesses testifying for each side. Rather, you should consider all the facts and circumstances in evidence to determine which of the witnesses you believe. You may find that the testimony of a smaller number of witnesses on one side is more believable that the

appellant's first trial:

> [T]he prosecutor's evidence seems, at first blush, to be quite formidable, for Benn was identified by five apparently disinterested witnesses. *But closer scrutiny places the strength of the case in substantial doubt.* All of the witnesses were strangers to Benn. When shown a photo spread which included Benn's picture, four of the five witnesses said that the photograph "looks like" the tall man who accompanied the decedent. Common sense tells us that many people resemble one another, and in that sense "looks like" is not really an identification at all. The purported coincidence that three of the witnesses described themselves as 95% certain understandably troubled the judge and indicates, at least, that someone probably suggested something to somebody. Benn was never placed in a line-up, and although all five witnesses "positively" identified him in the courtroom, it is difficult to hypothesize a more suggestive setting for an identifying witness, when the individual whom the witness had selected from the photo array was seated at the defense table, and the witness could infer that the police obviously believed that the man whose photograph the witness had described as "looking like" the culprit was indeed guilty. Depending on how the prosecution witnesses came across, the government may have had a fairly decent case, but by no means an overwhelming one.[107]

Whether or not the trial court disagreed with our judgment about the strength of the government's case, it was a necessary holding in our prior remand in *Benn I* and it was binding on the trial court.[108]

We recognize the general proposition that as the number of eyewitness identifications increases, the probability that they are all mistaken decreases. But it was the accuracy of each individual witness's identification, and the circumstances that may have influenced those initial identifications and that made possible their mutual reinforcement as a group, that the expert's testimony would have questioned. If the jury were persuaded by the expert testimony that the identifications were not as reliable as they seemed at first blush, defense counsel could have argued that in their deliberations the jurors should discount the witnesses' professed certainty in their identifications and that this was cause for reasonable doubt in the absence of corroborating evidence.[109]

Appellant argued that his defense depended on being able to cast doubt on the eyewitnesses' self-described confidence in their identifications of appellant, because it was the central feature of the government's case. In closing, the prosecutor

---

testimony of a greater number of witnesses on the other side.

**107.** *Benn I*, 801 A.2d at 145 (emphasis added) (footnotes omitted).

**108.** Because the judge who rejected the proffered expert testimony before the second trial was not the same judge who presided over the first trial, this is not a situation where the court had a superior basis to evaluate the eyewitnesses' testimony than did the appellate court in *Benn I*.

**109.** In *In re AS.H.*, we held that where an eyewitness's level of doubt in an identification lies within the 20–30% range, the evidence is insufficient (if that is all there is) to convict beyond a reasonable doubt as a matter of law. 851 A.2d at 462. In this case, the question is not whether the evidence is not sufficient to convict—it is more than sufficient, *cf. id.* at 457—but whether appellant was wrongfully denied an opportunity to present expert evidence that could have enhanced the jury's ability to more accurately assess and question the reliability of the identifications on which the jury would necessarily have to base a finding that appellant was guilty of a violent crime.

identified the "credibility" of the Mahoneys' identifications as the "key issue" for decision and hammered home to the jury that appellant was guilty because "each and every one of [the Mahoneys'] testimonies was credible; it was certain; it was reliable."[110] Without expert testimony to provide a foundation for his arguments, defense counsel could only make unsupported assertions in closing argument.[111] In rebuttal, the prosecutor again pointed to the weight of "five positive identifications of people who have no motive to lie, no bias, . . . no interest in the outcome of this case."

In a case grounded on eyewitness identifications of a stranger, without other corroborating evidence, and in which the defense depends entirely upon demonstrating that the identifying witnesses are not as reliable as they believe themselves to be, to preclude the defendant from presenting the scientific testimony of a qualified expert on research that is generally accepted and not known to lay jurors to prove this point is not harmless under *Kotteakos v. United States*,[112] *provided* that the facts underlying the identifications establish a sound foundation for applying the principles expounded by the expert.[113] As we

110. The prosecutor argued in closing:

> [T]he key question for you is this: Do you credit the five separate and independent eyewitness identifications of [appellant] as the man who abducted [ ] Williams out their apartment that night?
>
> And I submit to you that you should credit it because each and everyone of those testimonies was credible; it was certain; and it was reliable.
>
> \* \* \*
>
> So the question to ask yourself is: Did you believe these people when they got on the stand? Did they strike you, impress you as truthful people? And how do you do that?
>
> You evaluate their demeanor. How did they appear when they were testifying? Did they appear evasive? Or did they appear forthright?
>
> \* \* \*
>
> And you can evaluate the witnesses based on how they look. Did they look [appellant's] attorneys in the eye when they were testifying? . . . .
>
> \* \* \*
>
> Do they have a bias or a prejudice? None was brought out in this case. They didn't ask to be witnesses in this case. . . .
>
> Credibility. Let's talk about the certainty of their identifications of [appellant] as the man who abducted their loved one that night. How certain were they that this is the man who did it?

111. In its proffer to the court, defense counsel asserted that without the support of expert testimony, such arguments by counsel run the risk of being perceived by the jury as unwarranted attacks on honest, truth-telling witnesses.

112. 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We need not decide whether the more stringent standard for constitutional error applies. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The government does not contend that the trial court's exclusion of the evidence, if erroneous, was nonetheless harmless, and argues that if this court concludes that the trial court abused its discretion in excluding Dr. Penrod's testimony, "appellant would be entitled only to a remand for further proceedings on his motion." We have said, however, that prejudice that would warrant reversal is an inherent part of the analysis before a reviewing court may conclude on appeal that the trial court abused its discretion. *See Johnson*, 398 A.2d at 361.

113. *See LeGrand II*, 835 N.Y.S.2d 523, 867 N.E.2d at 375–76 ("[W]e hold that where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of [the] defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror.").

concluded with respect to the effects of sexual abuse on a child's memory, "[w]ithout an understanding of the reasons behind these behaviors, a jury *may automatically infer*"[114] that an honest profession of certainty ends the inquiry into witness reliability. We remand for further proceedings[115] on appellant's request to present expert testimony concerning certain factors that can affect the reliability of eyewitness identification.[116]

\* \* \*

ACCORDINGLY, the case is REMANDED for further proceedings consistent with this opinion.[117]

*So ordered.*[118]

SCHWELB, Senior Judge, concurring in the judgment:

I concur in the remand, and I agree with much of the discussion in Judge Ruiz' opinion. I write separately, however, because my emphasis differs significantly from the court's.

### I.

As we reiterated in our opinion in Benn's first appeal,

[a]n exercise of discretion must be founded upon correct legal standards. *See, e.g., In re J.D.C.*, 594 A.2d 70, 75 (D.C.1991). "A [trial] court by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

*Benn v. United States*, 801 A.2d 132, 142 (D.C.2002) (*Benn I*) (quoting *Teachey v. Carver*, 736 A.2d 998, 1004 (D.C.1999)). In my opinion, the transcript of the hearing at which the trial judge decided not to admit Dr. Penrod's testimony reveals that the judge departed from correct legal principles in three separate, though related, respects:

1. The judge seemed, at least initially, to treat the issue before him as being whether expert testimony is admissible in eyewitness identification cases generally. Indeed, the judge inquired as to the "score" as between judges who admit such testimony and those who exclude it. This approach effectively assumes that one rule fits all such cases, and that the answer is always yes or always no, regardless of the particular facts. This approach is contrary, *inter alia*, to *Green v. United States*, 718 A.2d 1042, 1051 (D.C.1998). Although the judge subsequently (and appropriately) disclaimed any absolute *per se* bar against receiving such expert testimony, he plainly disfavored such evidence, and he did not, at least explicitly, consider the specifics of the defense proffer in light of the record before him, as he was required to do by *Green* and by other authorities cited in the majority opinion.

114. *Mindombe*, 795 A.2d at 46 (internal quotation marks omitted) (quoting *State v. Chamberlain*, 137 N.H. 414, 628 A.2d 704, 707 (1993)).

115. *See Ibn–Tamas*, 407 A.2d at 640 (remanding for trial court's consideration of second and third *Dyas* criteria).

116. Appellant's motion listed eleven specific factors. *See supra* note 50.

117. The government, at the time it opposed the motion *in limine*, asserted that it did not have enough time "to retain its own expert to counter the defense testimony." We are confident that the government will be afforded sufficient time between our decision to remand and the commencement of proceedings on remand in which to procure its own expert if it so wishes. In fairness, appellant also should be permitted to amend the proffer to take into account more recent scientific developments and this opinion.

118. Because we do not decide that the expert testimony must have been permitted, but remand so that the trial judge may complete the appropriate analysis, we stop short of vacating the convictions and ordering a new trial.

2. The judge appeared to reject, as misinformed, the jurisprudence of appellate courts, including the Supreme Court, *see, e.g., United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and this court, *see, e.g., Benn I,* 801 A.2d at 145 n. 11, to the effect that, more than other evidence, "stranger-to-stranger identification is often untrustworthy and presents some danger of misidentification." Indeed, the judge stated: "I think, you know, it just doesn't."

3. The judge declared that he was "not impressed" by our analysis in *Benn I* of the quality of the eyewitnesses identifications in this case. That analysis, however, was a part of our holding in *Benn I,* 801 A.2d at 145. We concluded in *Benn I,* that the evidence for the prosecution was "fairly decent . . . but by no means overwhelming," and we ruled, substantially for that reason, that the trial court's error in excluding Benn's mother's testimony (for a violation of the rule on witnesses) was prejudicial rather than harmless.

In my opinion, Benn has not shown that our precedents require reversal of his conviction or that, on the merits of the defense motion, the judge's exclusion of Dr. Penrod's testimony constituted an abuse of discretion. I am not satisfied, however, that the judge based his exercise of discretion on correct legal principles, and for that reason—and for that reason alone [1]—

I do not agree with the government's view that we should affirm Benn's conviction.

## II.

This case is of ancient vintage. It arises from a crime which was committed in 1992. To some extent, almost seventeen years later, it remains shrouded in mystery. The record does not reveal, for example, how it came to be that Raymond Benn's photograph was included in the photo spread that was shown to the five members of the Mahoney family several days after the kidnaping and murder of Charles (Sean) Williams. No connection between Benn and the Mahoney family, or between Benn and Williams, was established. Although the motive for the crime was apparently the alleged nonpayment of a debt, there was no evidence that Williams owed Benn any money. Thus, almost two decades after Williams' death, we have yet to learn why Benn became a suspect.

Further, Benn secured a reversal in *Benn I* on the grounds that he was precluded from presenting an alibi defense, but he then asserted no such defense at the second trial. In other words, Benn initially claimed that he was denied a fair trial because his alibi was excluded, but when he had the opportunity to present his alibi to a jury, his attorneys declined to do so, preferring instead to attempt to attack the prosecution's case with expert testimo-

---

1. In their brief, counsel for Benn argued that the trial judge erred in relation to each of the three issues raised in this opinion, but they asked for reversal of Benn's conviction rather than for a remand. Counsel did not couch their argument explicitly in terms of the judge's failure to apply correct legal principles in the exercise of his discretion. The government might plausibly argue that the grounds for reversal relied on in the opinion of the court and in this concurring opinion have not been properly preserved, and that the government has not had the opportunity to brief these precise issues.

In my judgment, however, the basic points discussed in this concurring opinion are before the court, and the court is effectively granting "lesser included" relief to Benn. Although reasonable people might differ on the point, I conclude that Benn has preserved the underlying claim of abuse of discretion, and that although he has not made the precise arguments on which the remand is based, that is not dispositive. *Cf. Yee v. City of Escondido,* 503 U.S. 519, 535–36, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).

ny—a tactic which they could have used, but failed to employ, at Benn's first trial. I suppose that this was a legitimate defense tactic, but I find the sequence less than edifying.

However, be that as it may, it is undisputed, that all five Mahoneys positively identified Benn at the first trial[2] as one of the two men who abducted Williams from their home. This was not, by any stretch of imagination, a flimsy government case. If Benn is innocent, then all five Mahoneys, none of whom knew Benn or had any motive to lie, must have been mistaken in making their identifications. The five identifications tend to corroborate one another. Therefore, as we noted in *Benn I*, "the prosecution's evidence seems, at first blush, to be quite formidable, for Benn was identified by five apparently disinterested witnesses." 801 A.2d at 145.

But things are not always as simple as they seem. As we observed in *Benn I*, and as the court notes in the majority opinion,

closer scrutiny places the strength of the case in substantial doubt. All of the witnesses were strangers to Benn. When shown a photo spread which included Benn's picture, four of the five witnesses said that the photograph "looks like" the tall man who accompanied the decedent. Common sense tells us that many people resemble one another, and in that sense, "looks like" is not really an identification at all.[3] The purported coincidence that three of the witnesses described themselves as 95% certain understandably troubled the judge and indicates, at least, that someone probably suggested something to somebody. Benn was never placed in a line-up, and although all five witnesses "positively" identified him in the courtroom, it is difficult to hypothesize a more suggestive setting for an identifying witness, when the individual whom the witness had selected from the photo array was seated at the defense table, and the witness could infer that the police obviously believed that the man whose photograph the witness had described as "looking like" the culprit was indeed guilty.[4]

*Id.* (footnote omitted). Because of our "substantial doubt" regarding the strength of the case, we concluded in *Benn I* that the erroneous exclusion of Benn's mother's testimony was not harmless and that it required reversal of Benn's convictions and a new trial. Our assessment of the flaws in the government's case at the first trial was a part of our holding and the law of the case, and it was binding on the trial court.

## III.

At the beginning of the hearing regarding the admissibility of Dr. Penrod's proposed testimony, the judge posed the following question to Benn's attorney:

There are 59 judges on this court. What's the score? Do you keep score who allows [expert testimony regarding eyewitness identification] and who

---

2. And, again, at the second trial.

3. If a photograph of the real perpetrator was not in the array, then the witnesses might well have identified the person in the photo spread who most resembled him.

4. *See also In re As.H.*, 851 A.2d 456, 462 (D.C.2004):

Where ... the police consider an individual to be a possible perpetrator and a witness makes an initially ambiguous identification, there may develop a process of mutual bolstering which converts initial tentativeness into ultimate certainty. *In re Dwayne W.*, 109 Daily Wash. L. Rptr. 1901, 1906 (Super. Ct. D.C. 1981). "The victim relies on the expertise of the officer and the officer upon the victim's identification." *Id.* (quoting [JUDGE] NATHAN SOBEL, EYEWITNESS IDENTIFICATION, LEGAL AND PRACTICAL PROBLEMS 12 (1972 & Supp. 1981)).

doesn't. It is largely in favor of not allowing it, isn't that true?

Counsel acknowledged that "it's largely been in favor of not allowing it although not exclusively in favor of not allowing it." The judge's question was predicated on the assumption that expert testimony on this subject is either always admissible or always inadmissible, and that a majority of Superior Court judges who had confronted the question had ruled that it was inadmissible.

The prosecutor emphatically reinforced this assumption:

> I don't know the exact count, but my understanding of the 59 judges in this court is that only one has allowed it in. And that's because the vast majority of the judges in this court believe that this is a not uniquely scientific area that's appropriate for expert testimony.

Moreover, while acknowledging this court's statement in *Green* that "there may be cases in which a jury would find such testimony helpful," 718 A.2d at 1051, the prosecutor argued for a somewhat curious construction of the *Green* opinion:

> It doesn't say that there *are* cases where that would be helpful, but there may be at some point somewhere down the road a possibility.
>
> This is not the case. It would be our position that in fact *there's never a case* where the type of expert testimony they are seeking to introduce is appropriate because it would usurp the very gut of what the jurors are here to do. The jurors are here to assess credibility.

(Emphasis added.)

In fact, and contrary to the prosecutor's argument, we made it clear in *Green*, 718 A.2d at 1051, that "*Dyas*[5] and its progeny do not articulate a *per se* requirement that all expert testimony about the reliability of eyewitness identification must be exclud-

ed." On the contrary, we explained in *Green*, 718 A.2d at 1051, that

> the *Dyas* case and its progeny simply upheld discretionary calls by the trial court in the circumstances presented. *Dyas* does not exclude expert testimony about the reliability of eyewitness identification for all purposes and under all circumstances, even where a trial court, in its discretion, believes the jurors might find such testimony truly helpful. *Conversely, a determination by the trial court excluding such testimony as not "beyond the ken of the average layman" is a ruling only that upon the particular proffer made and in the concrete setting of that case, the possible assistance of the expert testimony to the jury is insufficient to outweigh the potential for distracting the jury or supplanting its customary role in evaluating credibility.* Under *Dyas*, as under any case concerning the admissibility of expert testimony, we will review the trial court's decision for abuse of discretion, whether the trial court admits or excludes the proffered testimony. *See Oliver v. United States*, 711 A.2d 70, 73 (D.C.1998) (per curiam) ("It is well established that a trial judge has broad discretion to admit or exclude expert testimony, and that a decision either way should be affirmed unless it is manifestly erroneous.") (quoting *Spencer v. United States*, 688 A.2d 412, 417 (D.C. 1997)); *cf. General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("A court of appeals applying 'abuse of discretion' review to such rulings may not categorically distinguish between rulings allowing expert testimony and ruling which disallow it.") *In other words, Dyas and its progeny do not articulate a per se requirement that all expert testimony about the reliability*

---

5. *Dyas v. United States*, 376 A.2d 827 (D.C. 1977).

*of eyewitness identification must be excluded.*

(Emphasis added.) We further stated in a footnote:

> In *State v. Schutz,* 579 N.W.2d 317 (Iowa 1998), the Iowa Supreme Court overruled its 1979 decision that established a *per se* rule excluding expert witness testimony on eyewitness identification. The court noted that it had found no appellate court other than Iowa that had such a *per se* rule. *See id.* at 320. It also noted that most of the scientific literature on the subject had been published subsequent to the 1979 decision. *See id.* at 319–20. The *Schutz* court cited a number of recent decisions that upheld the admission of such expert testimony or even held its exclusion to be an abuse of discretion. *See id.*

*Id.* at 1051 n. 9. *Green* thus stands for the proposition that, in exercising his or her discretion with respect to the admission of proffered expert testimony such as Dr. Penrod's, the trial judge must consider the "particular proffer made" in the "concrete setting of [the particular] case," in light of each of the three *Dyas* factors.[6]

In this case, the trial judge's inquiry regarding the "score" among Superior Court judges suggests that he may initially have been leaning towards the inflexible view favored by the government, namely, that expert testimony is never admissible in an eyewitness identification case. Later in the hearing, however, the judge took a more nuanced position, and he sensibly declined to adopt a *per se* rule. The judge stated that in his experience "the worst kind of eyewitness cases are one-witness identification cases," but that "when we have five eyewitness[es] ... who positively or almost positively identify somebody, you feel much more confident about the accuracy of the overall identification process than you do if it's only one witness." He added:

> "I don't think this is one of those cases that *Green* ... talks about where this kind of testimony would be helpful ... I don't want to be construed as saying I would never allow it. But I don't think this is the right case. I just don't."

Because the judge thus ultimately disclaimed adherence to any *per se* rule excluding expert testimony in all eyewitness identification cases, it cannot fairly be said that he failed to exercise discretion.

The judge did not, however, allude at all to the specifics of the defense proffer or to the proposed content of Dr. Penrod's testimony. According to Benn's counsel, Dr. Penrod was prepared to testify that, according to his empirical research, (1) there exists only a moderate correlation between a witness' confidence or certainty in an identification and its actual accuracy; (2) over time, witnesses may grow increasingly confident in the accuracy of their identification, on account of influences that have no bearing on reliability; (3) witnesses are highly susceptible to unconscious influences during identification procedures; (4) stress and the presence of a weapon reduce, rather than enhance, accurate recollection and perception; and (5) the accuracy of an identification diminishes when the

---

6. In *Dyas,* we identified criteria for the admissibility of expert testimony

> (1) the subject matter "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman*"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference

*will probably aid the trier in his search for truth"*; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."

376 A.2d at 832 (quoting McCormick on Evidence, § 13, at 29–31 (E. Cleary 2d ed. 1972)).

witness has only a short time to observe the assailant, especially when more than one person participated in the criminal activity. The gravamen of Dr. Penrod's evidence would have been that many of the conclusions supported by the research are unknown to lay jurors, and that some of these conclusions are counter-intuitive. The judge did not analyze, or even mention, any of the specific subjects regarding which Dr. Penrod was prepared to testify, nor did he focus on how such specific testimony would bear on the three *Dyas* factors in the context of the identification testimony in this case.

In my view, it is fair to say the judge started with the conception that exclusion of expert testimony regarding the reliability of eyewitness identification of strangers was the norm, and that at least in most cases, such testimony would not be helpful. Further, although, as the hearing proceeded, the judge wisely disclaimed adherence to a *per se* rule of exclusion, and although he appropriately differentiated between a single positive identification and five positive identifications, he did not focus "upon the particular proffer made" in "the concrete setting of [this] case" to determine whether Dr. Penrod's testimony would assist the jury rather than distract it. *Green,* 718 A.2d at 1051.

## IV.

"The vagaries of eyewitness identification, and the potential for wrongful convictions or adjudications based upon such evidence, have long been recognized in the District of Columbia." *In re As.H.,* 851 A.2d at 459–60 (citing *United States v. Telfaire,* 152 U.S.App.D.C. 146, 149–51, 469 F.2d 552, 555–57 (1972) (per curiam)); *Crawley v. United States,* 320 A.2d 309, 311–12 (D.C.1974). In deciding Benn's first appeal, we also took note of the dangers posed by eyewitness identification of strangers:

The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. *Webster v. United States,* 623 A.2d 1198, 1204 n. 15 (D.C.1993) (quoting FELIX FRANKFURTER, THE CASE OF SACCO AND VANZETTI (1927)). This passage by Professor (later Justice) Frankfurter was also quoted in *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *See also Wehrle v. Brooks,* 269 F.Supp. 785, 792 (W.D.N.C. 1966), *aff'd,* 379 F.2d 288 (4th Cir.1967) ("[p]ositive identification of a person not previously known to the witness is perhaps the most fearful testimony known to the law of evidence"); *accord Webster, supra,* 623 A.2d at 1204 (quoting *Wehrle*); *Jackson v. Fogg,* 589 F.2d 108, 112 (2d Cir.1978) ("convictions based solely on testimony that identifies a defendant previously unknown to the witness are highly suspect") (internal brackets omitted).

*Benn I,* 801 A.2d at 145 n. 11.

In light of "the possibility that a mistaken identification may send an innocent person to prison," *As.H.,* 851 A.2d at 460 n. 7, appellate judges have an obligation to draw upon their own experience and common sense to ensure that a verdict of "guilty" based on eyewitness identifications by strangers is in keeping with the facts. *See Crawley,* 320 A.2d at 313. The increasing judicial acceptance of expert testimony on this subject is grounded in the concern that an innocent defendant may be found guilty. In this case, however, the trial judge indicated that he found such concerns groundless. When Benn's attorney cited this court's statement in *Benn I* that the testimony of stranger eyewitnesses is "proverbially untrustworthy," the judge, remarked:

THE COURT: That seems one of the—to be one of these revealed truths in the law that somebody said about 100 years ago and it's picked up in opinion after opinion after opinion. And we don't know that that's so. I don't know that's so. And I don't know that Penrod knows that it's so either.

Subsequently, the judge reiterated the same theme:

But I don't—I'm not convinced in any way when an appellate court says stranger-to-stranger identification has some danger of misidentification. I think, you know, it just doesn't—I don't know why they are in any position to make that statement case after case, year after year, century after century, if you will.

The hazards of wrongful convictions resulting from mistaken identifications of strangers are not imaginary. As I have noted, Professor (later Justice) Felix Frankfurter wrote more than eighty years ago that these dangers had been established "by a formidable number of instances in the records of English and American trials." FRANKFURTER, THE CASE OF SACCO AND VANZETTI (1927). Justice Frankfurter's thesis remained valid forty years later, when the Supreme Court quoted his work in *Wade*, 388 U.S. at 228, 87 S.Ct. 1926, and the number of miscarriages of justice resulting from faulty identifications had grown even more "formidable." The problem remains with us today; indeed, the availability in recent years of DNA evidence has demonstrated the extent and pervasiveness of the problem:

Every major study of wrongful convictions in the last decade has concluded that eyewitness misidentification is the most common cause of wrongful convictions in America. Of the first 200 DNA-based exonerations, 79% of the cases involved an eyewitness misidentification.

Professor Cynthia E. Jones, *The Right Remedy for the Wrongly Convicted: Judicial Sanctions for the Destruction of DNA Evidence*, 77 Fordham L.Rev. 2893, 2929 (May 2009) (footnote omitted); *see* JENNIFER THOMPSON-CANNINO and RONALD COTTON, PICKING COTTON: OUR MEMOIR OF INJUSTICE AND REDEMPTION (St. Martin's Press 2009).

The decisions of the Supreme Court and of this court recognizing the potential for misidentification when the accused is a stranger to the witness are grounded in reality. They provide the legal context in which judicial discretion must be exercised at the trial court level. Given the fact that at the time of the hearing, expert testimony regarding eyewitness identification had seldom, if ever, been admitted in the Superior Court, and considering that no decision excluding such testimony had ever been reversed by this court, the trial judge's unwillingness to admit such evidence in this case is certainly understandable. Nevertheless, in rejecting the appellate precedents which defined the legal context under which the issue arose,[7] the trial judge did not exercise his discretion in conformity with the applicable legal standards.

## V.

Towards the conclusion of the hearing regarding Professor Penrod's proposed

---

7. It is true that the opinions which the trial judge questioned did not deal with the admissibility *vel non* of expert testimony. However, a major factor in determining whether such testimony should be admitted is the strength of the government's case, for the less corroboration that there is for an identification by a stranger, the stronger the argument is for receiving expert evidence. *See, e.g., Hager v. United States*, 856 A.2d 1143, 1149 (D.C. 2004). The authorities which were the subject of the judge's skepticism were thus indisputably relevant to the issue, before us.

testimony, the trial judge, having previously indicated that he disagreed with the concerns of this court and of other appellate courts regarding the reliability (or lack thereof) of stranger eyewitness testimony generally, disclosed that he was likewise unpersuaded by this court's evaluation of the strength of the specific eyewitness testimony at Benn's first trial. The judge stated:

> I'm not impressed by [the court's] analysis from—as far as the quality of the eyewitness identifications in this case either. That does not impress me at all one way or the other.

In volunteering this comment, the judge was obviously referring to the passage in *Benn I,* quoted in Part II of this opinion, in which this court stated, that "closer scrutiny places the strength of the [prosecution's] case in substantial doubt." 801 A.2d at 145.

As I have previously noted, the court's assessment of the government's case was a part of its holding that the judge's erroneous evidentiary ruling at Benn's first trial was not harmless. Further, the decision whether to admit expert testimony on behalf of the defendant depends in substantial part on the strength of the government's evidence. "The opinions that rule that the exclusion of the expert testimony was or may have been error are typically those where there was little or no evidence to corroborate the eyewitness identification." *Hager,* 856 A.2d at 1149 (quoting *Commonwealth v. Santoli,* 424 Mass. 837, 680 N.E.2d 1116, 1119 (1997)).

At the time that the judge ruled on the admissibility of Dr. Penrod's proposed testimony, the evidence at Benn's first trial constituted the only material available to him regarding the strength of the government's evidence. The *Benn I* trial was before a different judge, and the trial judge in the present case had no more information regarding the demeanor of the

witnesses than this court had when it decided *Benn I.* If the judge believed, as he plainly did, that the identification testimony was more compelling than this court thought it was, then that belief necessarily encouraged him to exclude the expert evidence more readily than he would have done if he had believed the evidence to be weaker. It therefore follows that, having declared that he disagreed with this court's evaluation of the strength of the identifications, the judge excluded the proposed expert testimony on the basis of a view of the relevant facts and law which was at variance with an important part of the reasoning of the appellate court in *Benn I.* In other words, on the narrow point at issue, the judge applied his own legal standard, rather than the standard articulated by this court.

As we noted in *Benn I,* 801 A.2d at 145, it is often difficult to make an accurate assessment of the strength of a case when the judge making the assessment has not seen or heard the witnesses. This difficulty confronts a successor trial judge just as it does an appellate court. To be sure, reasonable people can read the same transcript and come to different conclusions as to the persuasiveness of the government's evidence. In this case, however, the appellate court had addressed the point in some detail and, for reasons set forth in some detail in its opinion, it had concluded that the eyewitness testimony was less than overwhelming. Indeed, this was an important reason for reversal in *Benn I.* Under these circumstances, I do not believe that the trial judge, who had already revealed that he did not share the concerns of appellate courts generally regarding the reliability of eyewitness identifications of strangers, was free, in exercising his discretion, simply to reject this court's reasoning in *Benn I.*

## VI.

This is not an easy case. At the time the judge made his decision, a ruling admitting expert testimony such as that proffered here by the defense would have been a rarity, and certainly a departure from the norm in the Superior Court. Moreover, notwithstanding the problems with the particular eyewitness testimony enumerated in *Benn I*, the government presented five witnesses, all members of the same family, none of whom had any apparent reason to lie, and all of whom ultimately made positive identifications of Benn.

The mutual corroboration provided by the five identifications did not necessarily make this an overwhelming prosecution case, but their collective weight also should not be minimized. Nevertheless, with the record as it stands, I cannot be confident that the judge exercised his discretion in conformity with correct legal principles. Accordingly, I join my colleagues in remanding the case.